Goodman *v.* Simonds.

————◦◦◦◦————

GOODMAN, Respondent, *vs.* SIMONDS, Appellant.

1. A party to whom negotiable paper is transferred merely as collateral security for an antecedent debt, will hold it subject to all the equities existing between the original parties.
2. A. delivered to B. his acceptance, payable four months after its date, for which a blank was left, with authority to negotiate the same. At the time of negotiating the bill, B. filled the blank with an anterior date. *Held,* the bill was void in the hands of the party receiving it, with knowledge that it was ante-dated.

*Appeal from St. Louis Circuit Court.*

This was an action of assumpsit, commenced in February, 1849, by Timothy S. Goodman against John Simonds, on a bill of exchange, dated September 12, 1847, drawn by Wallace Sigerson, of Cincinnati, Ohio, on John Simonds, in favor of John Sigerson, for $5000, four months after date. The de-

claration averred the acceptance of the bill by John Simonds, and the endorsement thereof by John Sigerson to T. S. Goodman & Co., who endorsed the same to W. Nesbit & Co., who endorsed the same to the defendant. At the April term, 1849, the defendant filed the statutory plea, " defending the demand of the plaintiff."

At the trial, which took place at the April term, 1853, the plaintiff introduced the bill of exchange, and proved the endorsements thereon, as stated in the declaration. William Nesbit, a witness for the plaintiff, stated that the bill was sent by the house of T. S. Goodman & Co., of Cincinnati, Ohio, to the house of W. Nesbit & Co., of St. Louis, for collection, a short time before its maturity. At maturity, the bill was presented to the defendant, and payment demanded and refused, whereupon it was protested for non-payment. W. Nesbit & Co. only held the bill for collection, and after the protest they endorsed it without recourse, and handed it to an attorney for collection. The endorsement was made to T. S. Goodman by request of the attorney, to facilitate collection.

The evidence for the defendant was substantially as follows : On the 21st of June, 1847, John Simonds, of St. Louis, wrote to Wallace Sigerson, of Cincinnati, stating that John Sigerson and himself were going to deal in pork another season, and desired the assistance of W. S. in procuring facilities in Ohio, as the Bank of Missouri furnished no accommodations. Inclosed in this letter was the bill of exchange sued upon, together with another for the same amount, both perfect, with the exception of blanks for the name of the drawer and the date. The letter instructed W. S. to negotiate one of the bills on receipt and remit the proceeds, and hold the other until further instructions.

On the 12th of July, 1847, W. S. procured one of the bills to be discounted in the Trust Company Bank, and remitted part of the proceeds to the defendant. The other bill, being the one sued upon, he left in the hands of T. S. Goodman & Co., on the 18th of October, 1847, as collateral security for two notes given by him, dated October 12th, 1847, one for

$2832 64 and the other for $2830 45, having respectively sixty and seventy-five days to run. These notes were given to take up other notes of W. S., then lying over. No money was advanced by T. S. G. & Co. to W. S., nor was any new indebtedness created upon the faith of the defendant's acceptance. When T. S. G. & Co. received the bill sued upon, they promised that they would not send the same to St. Louis for collection until the maturity of the notes. On the 20th of November, 1847, T. S. G. & Co. wrote to E. W. Clark & Bros., of St. Louis, inclosing to them the bill, and instructing them to sell it at the best rates, not exceeding a discount of twelve per cent. They stated in their letter that they did not endorse the bill, as they were selling it for another. The evidence of brokers was offered, to show that this language did not imply that Goodman & Co. were not the owners of the bill. E. W. Clark & Bros. offered it to the defendant for sale, who notified them not to negotiate it, as W. S. had no authority to use it. Thereupon, they returned it to Goodman & Co. When Goodman was asked by Wallace Sigerson why he had sent the bill to St. Louis before the maturity of the notes, he hesitated a moment, and then replied that he wanted to see whether it was worth any thing or not, or something to that effect. When W. S. delivered the bill to T. S. G. & Co., the blank for the date was not filled, but he gave them a writing authorizing them to fill it.

McDonald, a book-keeper of Goodman & Co., testified that from June until October, 1847, he frequently saw W. Sigerson conversing with Mr. Goodman about notes he had got discounted, and which were not paid; that before taking the two notes dated October 12th, Mr. Goodman used every exertion to get W. S. to give collateral security, and it was only on his being able to give such satisfactory security as Mr. Simonds' acceptance that the notes were taken, W. S. being at the time insolvent. The bill was entered on the discount book of T. S. G. & Co., as collateral security. Previous to taking the acceptance, Goodman enquired of the Trust Company as to the responsibility of Simonds, and received a favorable answer.

The notes, as collateral security for which the bill sued upon

was delivered to Goodman & Co., were never paid. The court instructed the jury that, if T. S. Goodman & Co. acquired the bill sued upon from Wallace Sigerson, as collateral security for an indebtedness of his own to them of equal or larger amount, without notice of his want of authority so to appropriate the same, the plaintiff was unaffected by such abuse of trust or improper conduct, and the defendant could not set the same up as a defence in this suit. The court of its own motion also gave the two following instructions:

3. If the bill was received by the said T. S. Goodman & Co. in the manner and for the consideration already stated, it lies upon the defendant to prove said knowledge or notice on the part of the said T. S. Goodman & Co., or of some member of said firm. It is not necessary that the parties, at the time of the transfer, should have had certain and positive knowledge of the abuse of power on the part of the said Wallace — such as if they had been told by him that he had no authority so to pass the bill to them, or as would have been derived from having been shown the instructions from his principal; but proof of such facts and circumstances, from which notice or knowledge may be satisfactorily inferred, or upon which men usually act in such cases, is sufficient.

4. But if, when the said bill was sent to the said Wallace by the parties interested, it was incomplete, having blanks for the date and the signature of the drawer, and he, the said Wallace, was authorized to fill up and negotiate the same, such knowledge or notice cannot fairly be deduced from the facts alone that the bill was not dated till at or about the time of its transfer; and that the said firm were then acquainted with the pecuniary condition and affairs of the said Wallace, and were urging him to give them collateral security for his indebtedness to them; that the said parties, at no time, made inquiry into his title or authority to transfer the bill; and that the said Wallace did not wish the bill sent to St. Louis for collection, and so told the parties at the time.

The court refused to instruct the jury that the plaintiff could

not recover on the bill, if it was delivered to the firm of which he was a member as collateral security for a previous indebtedness. An instruction that the ante-dating of the bill, with the knowledge of Goodman & Co., rendered the same void, was also refused.

There was a verdict and judgment for the plaintiff, from which the defendant appealed.

*Glover & Richardson*, for appellant. 1. That the holder of negotiable paper, who has taken it merely as collateral security for a pre-existing debt, and without notice of any objections, will be protected in his title, and that he will not be protected in such case, are propositions of law equally well supported by authority. The latter, we insist, is best supported by reason. The object of the rule which makes the holder of such paper safe, is to prevent losses to persons who might otherwise suffer from a confidence reposed in it. The rule implies that the holder has some way risked something through the confidence, which he is about to lose but for its beneficial interposition. When money or property is actually advanced on the faith of the paper, such a case exists, and the party ought to be secure on principle. When the paper is received in payment of a debt pre-existing or otherwise, and the evidence of the debt is surrendered, or the liability destroyed, the rule may be applied with reason and justice. But when the case is one merely of collateral security, it is difficult to perceive what the holder risks, how his confidence betrays him, or what injury he can sustain. A man may well hesitate to gurchase a bill in the market by parting with his money or his property, or surrendering his debt, while, if the same bill was tendered him as collateral security, he would be glad to take it. It can do him no harm; he absolutely hazards nothing. 2. The court erred in giving the fourth instruction. Whether T. S. Goodman & Co. purchased the bill in good faith, in the usual course of trade, for a valuable consideration and without notice, was a question of fact for the jury. The appellant had a right to their verdict upon the evidence. 8 Cow. 340. 12

J. R. 306.  4 Mass. Rep. 270.  3 Carr. & P. 325.  6 Ire-
dell, 199.  8 Ohio, 528.  12 Pick. 545.  7 Ala. 259.  4
B. & C. 330.  4 Binney, 471.  12 Mo. 381.  11 Mo. Rep.
116, 402.  3. The court erred in refusing to instruct the jury
that if the plaintiff took the bill, knowing that it was ante-
dated, he could not recover.

*Haight* and *Shepley*, for respondent.  1. Negotiable paper,
taken before maturity in the ordinary course of business, as
collateral security for a pre-existing debt, is held by the en-
dorsee, discharged of all equities between the original parties.
*Swift* v. *Tyson*, 16 Peters, 1.  *Mann* v. *McDonald*, 10
Watts, 270.  12 Smedes & M. 462.  *Blanchard* v. *Stevens*,
3 Cushing, 162.  *Loker* v. *Clark*, 11 Mo. Rep. 97.  2. The
court properly refused to instruct the jury that the filling up of
the blank left for the date, by inserting a date anterior to the
time of the transfer, made the bill absolutely void.  Nothing
is better settled than that, when a person gives to another an
instrument with blanks to be filled, he thereby gives him full
power to fill such blanks as he may deem best, and any filling
up of such blanks binds the original party to the instrument,
unless the person taking it had knowledge or notice that the
filling up was unauthorized.  *Huntington* v. *Branch Bank*,
3 Ala. 186.  Am. Law. Reg. for May, 1853, p. 422.

RYLAND, Judge, delivered the opinion of the court.

From the statement of the facts in this case, several impor-
tant questions arise, which it becomes necessary for this court
to notice.  There is no doubt that the bill of exchange on which
the suit is brought, was negotiated between Wallace Sigerson
and Timothy S. Goodman & Co., brokers at Cincinnati, some-
time in 1847, as collateral security, and the present plaintiff
being one of that firm, is affected with all the notice of the
transaction that the firm could be; for it is to be seen, that
the firm of T. S. Goodman & Co. sent the bill out to E. W.
Clark & Bros., at St. Louis, for sale, and one of the firm of

Clark & Bros. was informed by Simonds, the acceptor, that the bill was a forgery; that Wallace Sigerson had no authority or right to draw such a bill; that Clark & Bros. sent the bill back with this information to Goodman & Co., who sent it to Nesbit & Co., of St. Louis, for collection, and that Nesbit & Co., without recourse and without value, endorsed it to T. S. Goodman, the plaintiff, and this was done by the advice of the attorney, who brought the suit. Therefore it is to be considered, as it would have been, had it remained in the hands of T. S. Goodman & Co. It appears that this bill of exchange was passed to T. S. Goodman & Co. by Wallace Sigerson, on the 18th day of October, 1847; that it was negotiated with Goodman & Co. on that day, as collateral security, for the purpose of securing the payment of two notes discounted by Goodman & Co. for Wallace Sigerson — these notes bearing date 12th October, 1847 — one due in sixty days for $2836 64, the other due in seventy-five days, for $2830 45. These notes were given to take up other notes which had been lying over. It is in proof that, previous to Goodman & Co.'s taking these last notes, Goodman had used every exertion to get Wallace Sigerson to give collateral security, and a witness, the clerk of Goodman & Co., states that it was only on Wallace Sigerson's being able to produce such satisfactory security that the notes were taken. This collateral security was the bill of exchange drawn by Wallace Sigerson on John Simonds, of St. Louis, which was payable to John Sigerson for $5000, at four months, accepted by Simonds and endorsed by John Sigerson. This same witness states that, upon inquiry made by Goodman, and finding the ability of Simonds, he (Goodman) took the bill for five thousand dollars as collateral security, and in the discount book of the house of T. S. Goodman & Co., the bill of John Simonds is inserted as collateral security. This transaction, then, between Wallace Sigerson and Goodman & Co. took place on the 18th October, 1847. At that day, this bill was negotiated. It appears that the bill was originally drawn in blank, as to the date and the name of the drawer; it

was drawn for $5000; it was payable at four months from date; it was accepted by Simonds, endorsed by John Sigerson, the payee, and was forwarded by Simonds to Wallace Sigerson, with another bill in the same condition, in order to raise money to enable John Sigerson and John Simonds to carry on the pork business at St. Louis. It was sent to Wallace Sigerson, with instructions and directions what and how to do with it, in the month of June, 1847. It was in proof that Wallace Sigerson left the bill of exchange with Goodman & Co. some time after he received it; that when he left it, it was not complete — it lacked the date; that Wallace Sigerson left with Goodman & Co. an instrument of writing authorizing them to date the bill, but it was not dated until Sigerson dated it himself upon the settlement, when he gave his notes. Nothing was paid to Wallace Sigerson by Goodman & Co. for the bill: nothing to Jno. Sigerson or to Jno. Simonds, on account of it, but it was merely left as collateral security for the two notes, which were given for previously existing indebtedness by Wallace Sigerson to Goodman & Co. Wallace Sigerson remarked to Mr. Goodman that he did not wish the bill to go to St. Louis, under any circumstances, for collection; that he wished to pay the amount here (at Cincinnati,) and the notes were given so that they would mature long enough before the bill matured, for the holders to send it out for collection.

Here, then, is a creditor extremely anxious to get his debt either paid or secured: he urges the debtor by every possible exertion to secure it. His debtor is known to be much embarrassed, utterly unable to pay his debts. This debtor leaves a bill of exchange for five thousand dollars, payable in four months, with blank date, with this creditor; leaves an instrument in writing, authorizing the creditor to fill up the date; it is not done however. Afterwards, this same debtor leaves the bill of exchange, then with the blank date filled up, as collateral security for a pre-existing debt. Can it be said that the holder has given value for this bill under such circumstances? Can it be said that there are not circumstances here sufficient

to put a prudent man upon inquiry ?   What was the blank bill doing in the hands of a man so much harassed, so urgently importuned by his creditor, for so long a time ?   Why was it left with the same creditor still incomplete as to date ?   And why, at last, was it used as collateral security, with the request not to send it out for collection ?   A plain answer may be given.   This creditor saw, from the utter inability of Wallace Sigerson to pay his debt, that he must lose it, and in such a condition, any thing in the way of collateral security would be a fortunate occurrence.   He would not be worse off by taking this bill : he paid nothing for it : it might turn out to his advantage : he ran no risk in getting it passed to him as collateral : he did not thereby increase his demand against Wallace, and possibly he might secure his debt.   In my view then of the law in this case, such circumstances would charge a creditor, who takes a bill as collateral security for a previous debt, without any additional advance upon it, with notice of the rights and defences of other parties to it.

There is another ground of defence in this case, which destroys the plaintiff's right to recover, if it be true.   That is the ante-dating of the bill.   There can be no doubt that the bill was passed as collateral security only to Goodman & Co. either on the 12th or on the 18th of October, 1847.   The 18th is the date of the entry in the bank book of the firm of Goodman & Co., made by the clerk ; that then is the day the bill is perfected and negotiated, and by the terms of the bill it has four months to run.   Now it is not competent to shorten this time by ante-dating.   This must have been well known to Goodman & Co. ; they knew the day the bill was passed to them ; they could see from its face the purport of credit, four months from date, and the date must, from necessity, be when the bill is negotiated.   Now, though it may have been in their hands a blank, long before it was passed to them as collateral, this does not authorize the date to be put some thirty days back, to give it the effect in their hands of a three and not a four months' bill. They cannot but know the time when they thus obtained the

bill as collateral security; they could then see whether it was dated or not. It means "four months" from date of negotiation; it authorizes the person to whom it was sent to date at the time of negotiation. There can be no doubt that it was negotiated on the 12th or on the 18th of October, 1847. The book-keeper says on the 18th. Sigerson says, when he settled and gave the two notes, he left the bill with Goodman & Co., and then he dated it; or it was dated in his presence. It bears date the 12th of September, 1847, one month earlier than the notes—one month before it was negotiated. This is very suspicious, nay, it is fatal to the bill.

In 17 Wend. 221, it is said by the court, that the holder may put the blank paper in any form which shall accord with the *intent* of the names, either as makers, drawers, payees or endorsers. It is the intent of the parties, manifested by the face of the blank bill, which must control the holder. He cannot do violence to this intent.

In 5 Dana, 259, it is said by the court of appeals of Kentucky, if a sum and date were written on the paper, when signed and delivered, with the intention that it shall be filled up with that sum and that date, and with no other sum or date, and if, without authority, that sum and date be torn off, and a larger sum and earlier date inserted, the note, " as sued on," is not, in judgment of law, obligatory as the act of the apparent obligors.

Story, on Promissory Notes, says : " But it is very common for persons to sign their names in blank to a paper for the purpose of having a promissory note written over it, and in such a case, the note, when written, will bind the party, if done by a person properly authorized, in the same manner and to the same extent and from the same time, as if it had been originally filled up before the signature was made." Story on Promissory Notes, p. 13, sec. 10.

In the case of *Montague* v. *Perkins*, cited by the plaintiff's counsel, from the Law Reporter for October, 1853, Jervis, C. J., says: " A person by handing over to another his blank acceptance, gives him the opportunity of filling it up to the

amount and date limited by the stamp." Maule, J., said: "the defendant, by writing his name on the blank bill stamp, and issuing his blank acceptance, must be taken to have known that he put it in the power of any person who got hold of the paper, to make him appear to the public as the acceptor to any amount of which the stamp admitted. Why does the stamp have the effect of restraining the amount? Because the authority is presumed to be limited by the stamp, as to amount, and that appears on the face of the instrument."

Apply this doctrine to the bill in this case, and it will be seen that the time of "four months" appearing on the face of the bill, the authority to fill it up must be restrained as to time. It cannot be construed into power to make a four months' bill on its face, though blank as to date, become a bill of less time, by ante-dating it. The intention of the acceptor is plain, that he accepts only a bill at four months, when negotiation is completed, and this four months on its face is notice of this intention to all persons who see it in its blank form. The testimony shows that, in this case, this bill was in the hands of Goodman & Co., with its blank date; that the bill was afterwards filled up. Now, if it was filled by ante-dating, when the plaintiffs, that is, Goodman & Co., received it as collateral security, it must have been known to them, and they must be held to be conniving at this imposition on the acceptor.

In the nature of things, it is impossible for a prudent, careful man to shut his eyes to the circumstances surrounding this whole transaction with Wallace Sigerson and the bill, make no inquiries, and take the bill in the fair and usual course of business. But a man catching at every chance to save himself never inquires, so he can obtain collateral security, about the fairness of the transaction; he gives nothing for it: he risks nothing for it: then, common sense and common honesty unite in saying he shall take it, with the defences the other parties have against it in the hands of the original holder and party. We do not say that a bill of exchange, passed to a person in the payment of a pre-existing debt, would be liable in his

hands, without notice, to the equities or defences of the original parties; but that the holder of a bill merely as collateral security for a pre-existing debt, having given no value for it, no consideration for it, holds it liable to such equities. We know that there are authorities whose phraseology may be considered against this view, but we also know that there are authorities in its favor, and we think reason and justice unite in supporting it. See *Coddington* v. *Bay*, 20 Johns. Rep. 637. *Stalker* v. *McDonald and others*, as late as 1843, 6 Hill, 93. This last case is a very elaborate one, in which the opinion of Mr. Justice Story, in *Swift* v. *Tyson*, 16 Peters, is ably reviewed.

In regard to the ante-dating of the bill, see *Tate & Hopkins* v. *Evans et al.*, 7 Mo. 419. Authority was given by *letter* signed by Evans & Dougherty to J. S. Arnold to draw on them for an amount not exceeding $1500, at four months. This was dated 28th November, 1839. The bill of exchange was drawn on 23d December, 1839, and ante-dated 28th November, 1839, and the plaintiffs took the bill on the faith of the letter of Evans & Dougherty. The court below, from this statement of facts, found for defendants, and this court affirmed the judgment. Here the ante-dating rendered the bill void. Authority to draw at four months means four months from the time the bill is drawn. A bill at four months on its face, with blank date, is still to be four months from the time of its negotiation.

The instructions given by the court below did not put the law of this case before the jury. The court takes up a part of the case, and in effect says to the jury, these facts will not authorize a verdict for the defendant, and then the balance of the case is disposed of with similar effect. The instructions asked by the defendant in regard to the ante-dating of the bill, and in regard to the collateral security without consideration, ought to have been given.

The judgment of the court below is reversed, and the cause remanded, Judge Scott concurring; Judge Gamble not sitting.