A. Dymock, Appellant, v. The Missouri, Kansas & Texas Railway Company *et al.*, Respondents.

Kansas City Court of Appeals, May 22, 1893.

1. **Bills of Lading:** PLEDGES: TITLE. A bill of lading transferred to furnish security for advances is a pledge for the goods themselves unless circumstances indicative of a different intention appear, and the pledgee holds the legal title to the goods and is entitled to all the rights and remedies of a purchaser for value.

2. ———: COLLATERAL SECURITY: STOPPAGE IN TRANSITU: ANTECEDENT DEBT. A *bona fide* holder of a bill of lading as collateral security has a title to the goods which is paramount to the unpaid vendor's right of stoppage *in transitu*, but such right of stoppage is not cut off where the bill of lading is taken as collateral for or in payment of an antecedent debt.

3. ———: NOT NEGOTIABLE: STATUTE: COMMON LAW: CARRIERS. At common law a carrier can limit its liability and the statute relating to the bills of lading is in derrogation of the common law, and the object of the statute in requiring the insertion of the words "not negotiable" in bills of lading was not to effect any transfer of the title with notice that the shipper's vendor had not been paid the purchase price, etc., but to notify the shipper himself that the bill of lading was not subject to the operation of the statute.

4. ———: PARTY IN FAULT MUST SUFFER: ASSIGNABLE. One who clothes another with evidence of ownership of a bill of lading, thereby putting it in his power to deal with it as his own, is estopped to assert his real title as against a purchaser having no knowledge of such title; and this too though such bill be merely assignable.

*Appeal from the Jackson Circuit Court.*—Hon. Richard Field, Judge.

Affirmed.

*Porterfield & Adams*, for appellant.

(1) The Midland National Bank acquired no better right to the property in controversy than Brannock & Co., or the Currier Commission Company had therein. *Nat. Bank of Commerce v. Railroad, supra; The Brunswick Co. v. Martin Co.*, 20 Mo. App. 158. (2) As a matter of law, the words "not negotiable" printed on the face of the bill of lading were sufficient to put the bank upon notice of all equities attaching to the bill, and of all the infirmities of the holder's title. *Pruis v. Lumber Co.*, 20 Ill. App. 239; *Goodman v. Simonds*, 20 How. 365; *Andrews v. Pond*, 13 Pet. 65; Wade on Notice, sec. 90; *Hull v. Hale*, 8 Conn. 336; *Lallande v. Creditors*, 42 La. 705; *Lee v. Turner*, 15 Mo. App. 205; *Angle v. Ins. Co.*, 92 U. S. 342; Daniel on Negotiable Instruments, sec. 795a; *Booth v. Barnum*, 9 Conn. 286; *Rowland v. Fowler*, 47 Conn. 347; *Chouteau v. Allen*, 70 Mo. 340. (3) The bill of lading was appropriated by the bank in payment of a pre-existing debt. The bank is not, therefore, entitled to claim the property covered by the bill as a *bona fide* purchaser for value, as against the rights of the unpaid vendor. *Skilling v. Bollmann*, 73 Mo. 665, and authorities cited; *Goodman v. Simonds*, 19 Mo. 106; *Conrad v. Fisher*, 37 Mo. App. 352; *Eaton v. Davidson*, 21 N. E. Rep. (Ohio) 442.

*Lathrop, Morrow & Fox*, for respondents.

SMITH, P. J.—This was an action of replevin to recover possession of a car of sacked oats in the possession of the defendant railroad company. Under the writ of replevin the oats were delivered to the plaintiff. The Midland National Bank was made a party defendant, claiming an interest in the replevined property by

virtue of being the owner of a bill of lading covering it.

The facts disclosed at the trial were substantially as follows: Plaintiff was a grain dealer in Kansas City. On October 19, 1891, he made a contract with A. L. Brannock & Co. for the sale of the carload of oats in controversy. The contract was made with one G. B. Currier, who was a member of the firm of Brannock & Co., and also president of the Currier Commission Co. Nothing was said at the time of the sale, or at any other time, as to the terms upon which the oats were sold; but there was evidence tending to show that by a general custom existing in Kansas City sales of grain were to be paid for in cash on delivery. The carload of oats arrived in the city on October twenty-seventh, being shipped from Julesburg, Kansas, to plaintiff under a shipper's order bill of lading. The sale by plaintiff to Currier was made upon the terms "Memphis rates," which was shown to mean the price of the grain at Memphis, less the freight from Kansas City to Memphis.

On October twenty-seventh, in order to complete the terms of the sale, the plaintiff procured from the railroad company a bill of lading covering the car in controversy, whereby the oats were consigned to the plaintiff's order at Memphis. The plaintiff then made out an invoice of the car in question and procured weighers' certificates and certificates of inspection; he then indorsed this bill of lading by which the oats were consigned to Memphis, and delivered the bill of lading, invoice, inspectors' and weighers' certificates to Currier. Plaintiff received from Currier a check for the purchase price of the grain. This was shown by the evidence to be the usual and customary way of making sales of grain in Kansas City.

The check received by the plaintiff was upon the Midland National Bank and was deposited by plaintiff in the National Bank of Kansas City in the afternoon of the twenty-seventh. On the next day, October twenty-eighth, payment of the check was refused by the Midland National Bank and the check returned to the plaintiff. In the mean time, Currier proceeded to use this car to fill a contract of sale which he had with his correspondent, J. E. Mugge & Co., of San Antonio, Texas. He took the bill of lading which he had received from the plaintiff and surrendered it to the agent of the railroad company and received in lieu thereof the bill of landing in controversy, whereby the defendant railroad company undertook to ship the car of oats to San Antonio and deliver it to the order of the shipper, A. L. Brannock & Co. Printed in red letters across the face of this bill of lading were the words "*Not Negotiable.*" Currier then made out a draft upon J. E. Mugge & Co., San Antonio, Texas, for $323.62, the price for which he had sold the car, attached that draft to the bill of lading, and on about three o'clock of October twenty-seventh deposited the draft with the bill of lading attached in the Midland National Bank.

Since the decision of the case by us must, in a great measure, depend upon the nature of the transaction between the Currier Commission Company and the defendant bank, it becomes necessary to subject the evidence of that transaction to the closest scrutiny. The cashier of the defendant bank testified that, "the course of business between the Currier Commission Company and the bank was that the latter being in the grain business would ship large amounts of grain to different parts of the country and we accepted from them on deposit, and gave them credit for drafts drawn against these shipments with bill of lading attached, the bills of lading being made to *shippers' order* and covering

as we supposed the title to the property. These drafts with bills of lading attached were passed to the credit of the Currier Commission Company and they were drawn against as money. * * * The bank holds the draft and bill of lading for the reason that we have advanced the money to Mr. Currier *and bought the draft.* * * * This draft was deposited as cash and credit given in the bank book. The deposit was made in the usual and ordinary course of business. The draft has not been paid and is still held with the bill of lading by the defendant bank. The cashier on his cross-examination further testified that at the time the draft and bill of lading were received the account of the Currier Commission Company was overdrawn. * * * The proceeds of this draft went absolutely to *extinguish so much of the indebtedness of the Currier Commission Company to the bank.* It was not taken as *collateral security or for collection.* * * * We had a sort of understanding with the Currier Commission Company that any checks they might draw on their account to-day, for instance, which might be protested to-day, would be paid by us then, though they hadn't sufficient funds, provided they placed in our hands a sufficient amount of collateral. In other words the payment of a check was made something in the nature of a loan, the payment or loan being represented on our books by an overdraft against their *account and against which overdraft we held collateral.''* He further testified "that after the receipt of the draft and bill of lading the bank on that day paid two checks of the Currier Commission Company amounting to $534.20, which was greatly in excess of the amount of the draft. That on the next day when the Currier Commission Company failed its account was still overdrawn.''

We must determine the nature and effect of this transaction in the light of the testimony of the cashier

of the defendant bank, the material portions of which are presented by the foregoing excerpts. Now if the defendant bank bought and paid for the draft by subsequently advancing the amount of it in payment of the checks of the Currier Commission Company, it is quite difficult to understand how it was taken to absolutely extinguish the priory overdrafts of the Currier Commission Company. And it is equally difficult to understand what bearing the agreement referred to by the cashier between the bank and the commission company had on the transaction, if the bank received the draft in absolute satisfaction of the overdraft of the commission company. If under this agreement the bank did not pay the overdrafts of the commission company only when the latter had in its hands drafts with bills of lading attached as collateral security sufficient in amount to cover such overdrafts, then it remains to be accounted for how it was that on the morning the commission company deposited the draft and bill of lading in question that it was appropriated to the extinguishment of unprovided for previous overdrafts, or why the bank afterwards on that very day permitted the commission company to still further augment the amount of its overdraft by paying other checks far in excess of the amount of the draft that day received. No doubt the cashier made what was intended to be an honest and conscientious statement of the transaction as he understood it, but it is greatly deficient in that clearness and consistency which ordinarily ought to characterize such a statement. However all this may be, looking at the transaction in the light thrown upon it by the cashier's testimony aided by that of common business knowledge and we must conclude that the advancements made on the day of the deposit of the check and bill of lading were made upon such check and bill of lading and would not have been made but

for such deposit.    There is no evidence tending to show that the bank knew that the plaintiff had not been paid the purchase price of the grain.

This brings us to the consideration of the legal questions arising on the record before us.    It may be as well conceded, as it is by the defendants, that as to the defendant railroad company leaving out of consideration the claim of the intervening bank, that upon the undisputed facts the plaintiff's right of stoppage *in transitu* is clear enough.    *Hall v. Railroad*, 50 Mo. App. 179.

In the view of the evidence which we have taken, the bill of lading was transferred to the bank to furnish security for the advances that were made upon the faith of the transfer.    Few transactions are of more frequent occurrence in the broad domain of commerce and trade than the transfer of bills of lading as collateral security to a bank making an advance upon the credit of the pledgee's ownership therein indicated.    It seems to have become the customary mode of purchase and sale between parties who require the services of a carrier for delivery for the consignor to draw a draft for the price upon the consignee which with bill of lading attached he procures to be discounted.    It is held as security for the consignees' acceptance or payment of the draft through the holder's agent at the terminal point of the transit.    Such a transfer of the bill of lading is a pledge of the goods themselves unless circumstances indicative of a different intention appear.    The pledgee holds the legal title to the goods and in respect to them is entitled to all the rights and remedies of a purchaser for value.    *Dows v. Bank*, 1 Otto (U. S.), 618; *Tilden v. Muier*, 45 Vt. 195; *Bank v. Logan*, 74 N. Y. 568; *Bank v. Bagley*, 115 Mass. 228.

A *bona fide* holder of a bill of lading as collateral security has a title to the goods which is paramount to

the unpaid vendor's right of stoppage *in transitu.* *Skilling v. Bollman,* 73 Mo. 66; *Railroad v. McLiney,* 32 Mo. App. 167; Porter on Bills of Lading, secs. 512, 513; Benjamin on Sales, sec. 813; Colebrook on Collateral Security, sec. 384. But when the bill of lading is taken as collateral security for or in payment for antecedent indebtedness, the holder acquires no such title to the goods as cuts off the vendor's right of stoppage *in transitu.* *Skilling v. Bollman, supra; Goodman v. Simonds,* 19 Mo. 106; *Nappa Valley Wine Co. v. Rheinhart,* 42 Mo. App. 172. It inevitably results from these considerations that the bank acquired the title to the grain called for by the bill of lading, unless the words "not negotiable" which were stamped upon its face had the effect to reserve to the plaintiff as vendor the *jus disponendi* and thus prevent the *bona fide* purchaser, the bank, from acquiring the title it otherwise would have acquired by the transaction.

The statute of this state, section 744, prescribes that the manner of the negotiation of bills of lading shall be by indorsement and delivery in the same manner as bills of exchange and promissory notes. And it is further provided in the section just referred to that no printed or written conditions, clauses or provisions inserted in or attached to any such bill of lading shall in any way limit the negotiability or affect any negotiation thereof nor in any manner impair the right and duties of the parties thereto or persons interested therein; and that every such condition, clause or provision purporting to limit or affect the rights, duties or liabilities created or declared by chapter 18 shall be void and of no force or effect. The next section, 745, provides what shall be the effect of the transfer of a bill of lading by indorsement thereon in writing and delivery thereof so indorsed whether or not it contains any of the written conditions, clauses or provisions

affecting its negotiability or purporting to limit or affect the rights, duties or liabilities created or declared in said chapter, and which are rendered void by section 744; provided, however, such bill of lading which shall have the words *not negotiable* plainly written or stamped on the face thereof shall be exempt from the provisions of the act, that is, said chapter 18. It is well settled that a common-law carrier may limit its common-law liability by special contract with the shipper. *Ketchum v. Railroad*, 52 Mo. 390; *Levering v. Trans. & Ins. Co.*, 42 Mo. 88; *Oxley v. Railroad*, 65 Mo. 629; *Clark v. Railroad*, 64 Mo. 440; *Ball v. Railroad*, 83 Mo. 580.

By turning to the bill of lading received by the commission company of the defendant railroad and transferred to the defendant bank, and it will be seen that in addition to what such an instrument would ordinarily contain (Porter on Bills of Lading, sec. 4), it contains a great number of clauses specially limiting and effecting the rights, duties and liabilities of the parties thereto. Many of these conditions under the provisions of chapter 18 are void and inoperative. The statute in so far as it disables a public carrier from inserting in its bill of lading provisions of the character mentioned in section 744 is in derogation of the carrier's common-law right.

Now, when the carrier wishes to limit its liability to the extent allowed by the common law and to avoid the statutory prohibitions, it is required by the statute to have the words *"not negotiable"* plainly written or stamped across the face of the bill of lading so as to notify the shipper when he receives it that it is exempt from the operation of the statute. By this notice the shipper is warned to scrutinize the conditions of the policy and govern himself accordingly. The undoubted object of these words of the statute was not to affect any transfer of the bill of lading with notice that the

·shipper's vendor had not been paid the purchase price, or ·of any other infirmity in the shipper's ˙title to the .goods, but to notify the shipper himself that the bill of lading was not subject to the operation of the statute. This was the only office these words were intended to perform. The rights, · duties and liabilities of the parties to such a bill of lading is governed by the ·common law, unaffected by the statute in relation to bills of lading.

It is thus plain to be seen that the circuit court by its instruction erred in declaring that the plaintiff's right of stoppage *in transitu* as vendor of the grain existed against the bank notwithstanding the transference of the bill of lading by the commission company,· the shipper˙to it for value.

The order of the court setting aside the verdict on account of the giving of the instruction of which the plaintiff by his appeal complains was proper and must be affirmed.

ELLISON and GILL, JJ., concur in separate ·opinion.

· ELLISON and GILL, JJ. *(concurring.)*—We do not ˙wish to be understood as combatting the views expressed by SMITH, P. J., but we prefer˙ to place our ·concurrence on the ground that plaintiff placed the .apparent title to the property in Currier, clothing .him with the indicia of ownership and thereby putting it in his power to deal with the property as his own. Con-·ceding that the bill of lading was not negotiable, it was at least assignable. The authorities are abundant here and elsewhere that by so doing he is estopped from .asserting his real title as against a˙ purchaser having no knowledge of such title. 18 American & English Encyclopedia of Law, 641; *Bank v. Bank*, 71 Mo. 183; *Nehoff v. O'Rielly*, 93 Mo. 162; *Dows v. Kidder*, 84

N. Y. 121; *Leigh Bros. v. Railroad,* 58 Ala. 165; *McNeil v. Bank,* 46 N. Y. 325; *Combes v. Chandler,* 33 Ohio St. 178; *Cosdsby v. Vandenburg,* 101 U. S. 572;. *Shaw v. Railroad,* 101 U. S. 565.